**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Patrick Edward Wilcock,

    Petitioner

v.

Jo Gentry,[1] *et. al*.,

    Respondents

Case No.:  2:17-cv-02101-JAD-MDC

**Order Denying Petition, Denying a Certificate of Appealability, and Closing Case**

[ECF No. 46]

Petitioner Patrick Edward Wilcock is currently serving a 44-year-to-life prison sentence for the murder of James LaCella.  He moves for a writ of habeas corpus under 28 U.S.C. § 2254, asserting that he was deprived of his right to a speedy trial and that the state suppressed *Brady* evidence about a jailhouse-informant witness's prior crimes, which robbed Wilcock of his right to adequately confront the informant at trial.[2]  Because I find that the state didn't suppress any material information, Wilcock was adequately able to confront the state's witness, and the five-month trial delay that Wilcock experienced was not prejudicial, I deny his petition and close this case.

**Background**

Firefighters responded to a fire at James "Jimmy" LaCella's condominium on February 25, 2012, and found him dead in his recliner.[3]  Investigation revealed that LaCella had been

---

[1] According to the state corrections department's inmate-locator page, Wilcock is incarcerated at Lovelock Correctional Center.  The department's website reflects that Nethanjah Breitenbach is the warden for that facility.  I direct the Clerk of Court to substitute Nethanjah Breitenbach for prior respondent Jo Gentry under Rule 25(d) of the Federal Rules of Civil Procedure.

[2] ECF No. 46, grounds 1, 2, and 5.

[3] *See* ECF No. 68-21, Exh. 189 at 11.  Respondents' exhibits referenced in this order are found at ECF Nos. 54–69.  Petitioner's exhibits (Pet. Exh.) referenced in this order are found at ECF Nos. 13 and 29.

killed by a small-caliber gunshot to the head and had been dead for three to five days before his condo burned.  Detectives also discovered that Wilcock pawned several items belonging to LaCella right around the time of the fire.[4]  That April, a grand jury indicted Wilcock for burglary, robbery, possession of stolen property, and murder with use of a deadly weapon.[5]

**A.      Wilcock's trial was delayed approximately five months due to court congestion.**

Wilcock appeared for his initial arraignment on April 12, 2012.[6]  He pled not guilty and waived his speedy-trial right up to July 9, 2012.  But at a hearing in late June, the court informed the parties that it was trying a capital case that was going to extend two or three days into the week of July 9th and asked the parties whether the case would be eligible for "overflow" so that the trial could start on schedule.[7]  Wilcock stated that he didn't understand "overflow," so the court explained that going to overflow means that another judge takes over the case for trial and that, to be eligible, a trial must be able to finish in less than one week.[8]  The state expressed that there would be around 20 witnesses, many of which would be coming from out of state, and couldn't guarantee that the trial would be completed within a week.[9]  And defense counsel stated that he preferred not to go to overflow because he "prefer[red] this court to hear it."[10]  The judge explained the situation to Wilcock and told him that by agreeing to vacate and reschedule his trial, he was not giving up his speedy-trial rights:

---

[4] ECF No. 46 at 2.

[5] Exh. 38, ECF No. 54-2.

[6] Exh. 42, ECF No. 54-6.

[7] Exh. 77, ECF No. 55-16 at 11–15.

[8] *Id.* at 12–13.

[9] *Id.* at 11–12.

[10] *Id.* at 12.

1

2

3

4

5

6

7

        Court: So understanding that what your attorney is saying is he doesn't want to go to overflow, because he doesn't want to lose where he is.  Sometimes what you know is better than what you don't know.  You understand what I'm saying.
        Wilcock: So, I'm giving up my speedy trial.
        Court: You are not giving up your speedy trial.  Based upon scheduling issues we need to reset the trial in order to maintain it in this department.  I'll reset it as quickly as I can, for whatever date is available for the attorneys to try it.
        Wilcock: Okay.
        Court: All right.
        Wilcock: I don't have a choice, so, yeah.[11]

8

9

10

The state-court judge reiterated that he was not asking Wilcock to give up his speedy-trial right but that the court's calendar required a slight delay.[12]  The court reset the trial for December 3, 2012.[13]

11

12

13

14

15

16

17

18

19

        About a month after that hearing, the defense filed a motion for release on house arrest or to set reasonable bail pending trial.[14]  In that motion, the defense also argued that Wilcock's speedy-trial right had been violated.  The trial court held a hearing on the motion.[15]  The judge acknowledged that Wilcock steadfastly maintained his innocence but also noted that he had previously denied Wilcock's pretrial habeas petition because he concluded that enough evidence was presented to the grand jury that someone could find Wilcock guilty.[16]  The court reiterated that even though he had a capital case that would have run into Wilcock's scheduled July trial, he had been willing to find another judge to try the case.  Denying the motion, the court concluded

20

21

22

23

---

[11] *Id.*

[12] *Id.*

[13] *Id.* at 13–15.

[14] Exh. 78, ECF No. 55-17.

[15] Exh. 81, ECF No. 55-20.

[16] *See* Exh. 45, ECF No. 54-9; Exh. 52, ECF No. 54-16.

that this was not a situation in which the court frustrated the defendant's ability to go to trial. And Wilcock's trial wasn't delayed any further—it began on December 3, 2012. While he awaited trial, Wilcock was detailed at the Clark County Detention Center (CCDC).

**B.    Evidence presented at trial implicated Wilcock in Jimmy's murder.**[17]

>    **1.    *Jimmy disappeared for about a week and was found dead after his condo caught fire.***

Jimmy's mother Mary LaCella testified at trial that she managed a trust fund that Jimmy's father had left him when he died, and she paid all of Jimmy's bills.[18] Jimmy had numerous collections of hobby toys in his condo, including trains, train tracks, and remote-control ("RC") cars. On Friday, February 17, 2012, Jimmy had come to her house with a bill for truck tires and also told her that his auto-insurance payment was due. That was the last time she ever saw him alive.

Mary called Jimmy's cell phone repeatedly between February 17th and 21st, but he never answered. She went to his home on the 21st; no one answered, and his door and truck were locked. She returned that night, and when Jimmy didn't answer, she stuck a note on his front door telling him that she had paid his auto insurance. She went back every morning and every evening for the rest of the week, but Jimmy never answered and she never saw any lights on.

---

[17] I make no credibility findings or other factual findings regarding the evidence or statements of fact in the state-court record. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this court. Any absence of mention of a specific piece of evidence or category of evidence does not mean that I overlooked it in considering Wilcock's claims.

[18] Exh. 110, ECF No. 60-1 at 97–132. Because Jimmy and Mary share a last name, I refer to them by their first names throughout this order for clarity. No disrespect is intended by doing so.

William Kasin, a longtime friend of Jimmy's, also went by his condo twice that week, but no one answered the door.[19]  The second time he visited, he saw the note from Jimmy's mother. Kasin thought that the last time he saw Jimmy was around February 7th or 8th.  Jimmy's downstairs neighbor Deborah Fisher also testified that she hadn't seen Jimmy in the week or so leading up to the fire.[20]  Jimmy's neighbor Dolores O'Halloran had been friends with Jimmy since she and her husband moved into their condo 20 years earlier.[21]  She hadn't seen Jimmy for more than a week before the fire.  He frequently had dinner at their house and she had called to invite him over sometime shortly before the fire, but he never called her back.  O'Halloran saw Mary come by a few times that week looking for Jimmy.

Various witnesses testified about their knowledge of Wilcock and Jimmy's friendship and their sightings of Wilcock around the building the week before the fire.  Kasin said that a man named Jeff Morelli sometimes lived with Jimmy, and Jimmy, Morelli, and Wilcock would drive RC cars together.  Fisher testified that Wilcock visited Jimmy frequently and she was familiar with Wilcock's truck.  She did not see Wilcock that week, but she did see his truck parked at the condo complex.  And on the Thursday before the fire, O'Halloran was working in her yard when she heard the door slam at Jimmy's complex.  She thought he was coming down, so she went around the corner and was surprised to see someone else exiting his condo.  She recognized the man as someone who frequented Jimmy's house.  She did not identify Wilcock in court as that person, but she did identify him as "Pat" in a photograph and said that he was the

---

[19] Exh. 111, ECF No. 61-1 at 54–95.

[20] Exh. 112, ECF No. 62-1 at 114–130.

[21] *Id.* at 130–146.

person she saw coming from Jimmy's condo that day.  O'Halloran told Pat she had expected him to be Jimmy and asked him how Jimmy was.  Pat replied that Jimmy was fine.

On the morning of Saturday, February 25th, O'Halloran called Mary and told her that Jimmy's condo was on fire and he was still inside.  Fisher also smelled gas and fire in her apartment when she woke up that morning and saw smoke bellowing from Jimmy's condo.  Firefighters found Jimmy's body in his living-room recliner.  The coroner determined that he had died of a gunshot to the top of his head from an undetermined range.[22]  A Las Vegas Metropolitan Police Department (Metro) forensic analyst identified bullets and bullet fragments from the scene as .25 caliber.[23]  The coroner determined the cause of death to be homicide and estimated that Jimmy had died three to five days before the fire, by February 21st at the latest.  While investigating the fire and Jimmy's death, officers found numerous RC cars and an extensive train collection, among other collections.

Dan Heenan, senior special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives and certified fire investigator examined the scene about a month after the fire.[24]  He determined that the fire did not start in the main electrical box.  Instead, there was a heavily damaged area in the flooring assembly between the first and second floors of the building.  Heenan initially could not determine the cause of the fire, but over the course of his investigation

---

[22] Testimony of Larry Simms, forensic pathologist with Clark County Coroner.  Exh. 110, ECF No. 60-1 at 69–97.

[23] Testimony of Angel Moses, Exh. 111, ECF No. 61-1 at 122–153; *see also* Exh. 113, ECF No. 63-1 at 80–160; Exh. 114, ECF No. 64-1 at 5–91 (testimony of Tate Sanborn).

[24] Exh. 111, ECF No. 61-1 at 178–198, 205–224.

1 he concluded that it was likely intentionally set using wadding placed between Jimmy's

2 floorboards and the ceiling of the apartment below.[25]

3        **2.**     ***Wilcock's suspicious actions suggest his involvement in Jimmy's death.***

4        Several people associated with Wilcock testified about his actions and behavior in the

5 weeks surrounding Jimmy's death. Patricia Riley, a friend of Wilcock's for about eight years,

6 testified that Wilcock gave her a semi-automatic gun and a bag of .25-caliber bullets in

7 December 2011.[26] But in February 2012 Wilcock asked her to return the gun, telling her that his

8 girlfriend had an injured dog and he wanted to put it out of its misery, and she gave it back to

9 him. Sandra McConnell, Wilcock's neighbor and friend (though she testified that their

10 relationship was at one point "intimate"), testified that she had several dogs at the time but never

11 asked Wilcock to euthanize any of them.[27]

12        McConnell further testified that when she was at Wilcock's house (where he lived with

13 his mother, Judy Dunn, and his grandmother Rosalie) one night in February 2012, he showed her

14 a "Baja Buggy" RC car and two trains. He told her that Jimmy had given them to him because

15 he was helping Jimmy clean up after a fire. McDonnell agreed that Wilcock had expressed his

16 annoyance that Jimmy had nicer, more expensive things than he did. McConnell testified that

17 when Dunn saw the RC car and trains, she told Wilcock that he needed to sell the items on eBay

18 to pay her back after he had pawned some of her property. Dunn then asked Wilcock if he had

19 pawned her metal detector, and he responded that he hadn't, but that he and Jimmy had used it to

20

---

21 [25] Heenan's ultimate conclusion relied somewhat on the testimony of a jailhouse informant, Todd
22 House, who told officers that Wilcock told House that he would set a fire by igniting "wadding" placed under the floor. *See infra* at p. 11.

23 [26] Exh. 111, ECF No. 61-1 at 95–118.

[27] Exh. 112, ECF No. 62-1 at 96–114.

look through fire rubble.  And after Wilcock returned from a three-day trip to Utah during this timeframe, Dunn asked him to pay back some money that he owed her.  Wilcock responded that he had given the money to Jimmy for a hotel because he had a house fire and had nowhere to stay.  But O'Halloran testified that there had been only one fire at Jimmy's, and that was the one during which Jimmy was found dead.[28]

Dunn testified that Wilcock and Jimmy were close friends; Jimmy would come over frequently for dinner and play video games on her big-screen TV with Wilcock.[29]  She recalled that, sometime in February 2012, Wilcock brought the Baja Buggy to the house and told her that it belonged to Jimmy and the two were going to sell it on eBay.  Sometime after that, Wilcock put a train of Jimmy's on eBay, and he told his mother that he was on the phone with Jimmy while he was putting it up for sale.  The first time she heard anything about the fire and Jimmy's death was when the police came to her house.  In response to questioning by the state, Dunn agreed that at one point she and her mother each had .25 caliber firearms, and they no longer had either gun.  But she didn't recall that she filed a police report in 1996 reporting that her gun was stolen.  The gun used to kill Jimmy was never recovered.

### 3.  *Metro uncovers more evidence tying Wilcox to the crimes.*

Metro homicide detective Tate Sanborn testified that, after the murder, Wilcock sold several items on eBay including collectible RC cars.[30]  During the course of the investigation, Sanborn spoke with Riley, who told him about the handgun that Wilcock gave her and then took back.  He went through surveillance video from cameras on Wilcock's property, which showed

---

[28] Exh. 112, ECF No. 62-1 at 130–146.

[29] Exh. 112, ECF No. 62-1 at 8–58.

[30] Exh. 113, ECF No. 63-1 at 80–160; Exh. 114, ECF No. 64-1 at 5–91.

Wilcock arriving in his truck on February 21st and carrying two train boxes and the Baja Buggy car inside his home.

Wilcock was home when Sanborn and other law-enforcement officers executed a search warrant for Dunn's house and property. Wilcock was sitting in a chair in the front yard with his dogs, chatting casually with officers. When the detectives found the key to Jimmy's truck at the bottom of a trash can, Wilcock's demeanor changed.[31] He appeared "deflated" and no longer talked to the officers.[32] The hard drive of a computer seized in the search contained copies of the CIA's Book of Dirty Tricks and eight versions of the Anarchist Cookbook. Sanborn described the Anarchist Cookbook as an instruction manual for "destruction," with lessons on how to "make bombs . . . , how to start a fire, how to kill someone, how to disappear, how to commit credit-card forgery or fraud and not get caught."[33] He characterized the Book of Dirty Tricks as "a manual to seek revenge on people you felt have done you wrong."[34]

Wilcock voluntarily came to the police station for an interview on March 2, 2012. He said he had last seen Jimmy on February 20th. Sanborn and Wilcock discussed Jimmy's collections, including his collection of bullets and cartridges. The police had not told Wilcock anything about the crime scene, but his response about where the collection was displayed indicated that he knew where Jimmy's body had been found. Wilcock said that he would see Jimmy almost every day, though he didn't know if his family had held a funeral yet.

Cellphone records showed that Wilcock's phone was using the cell tower directly in front of Jimmy's home from February 20th at 8:43 p.m. through the morning of February 21st at about

---

[31] Metro Homicide Sergeant John Scott testified similarly. Exh. 111, ECF No. 61-1 at 168–178.

[32] Exh. 114, ECF No. 64-1 at 132.

[33] Exh. 113, ECF No. 63-1 at 144.

[34] *Id.* at 140–41.

6 a.m.  At 11 a.m. on the 21st, Wilcock's phone was using the tower located near his own residence.  Many videos on Wilcock's phone showed Wilcock and Jimmy racing RC vehicles in the desert.  Detective Sanborn also listened to a phone call that Wilcock made to his mother from jail in December 2012.  He asked her to use the descriptor "borrow" instead of "took or taken" when she testified in his trial, reasoning that "took or taken" suggested that a crime had occurred.  He asked her to keep her answers short and avoid volunteering additional information.

Metro homicide detective Travis Ivie also discovered that Wilcock pawned numerous items after Jimmy's death, including a PlayStation console.[35]  The serial number on the PlayStation matched a partially charred box Ivie recovered from Jimmy's house.  Ivie also spoke with Judy Dunn at her home.  She told him that her home had been burglarized several times, and she thought her son was the thief.

### 4. Wilcock shares details of the fire with a fellow detainee, who then turned state's witness.

Todd House, a CCDC inmate who was housed with Wilcock while he was awaiting trial, also testified for the state.  The prosecutor's questioning first focused on House's extensive criminal record: he testified that he was presently incarcerated after pleading guilty to a grand-larceny charge for stealing a car, had been arrested "quite a few" times, and had several felonies on his rap sheet, including convictions for credit-card theft, fraudulent use of a credit card, and theft of a "government installation device."[36]  House had a college degree in education and, while at CCDC, he helped other inmates with reading and paperwork.  Though he didn't have

---

[35] Exh. 112, ECF No. 62-1 at 58–92.  A Las Vegas pawn-shop manager corroborated Ivie's investigation, testifying that Wilcock pawned a gaming system and some games on February 21, 2012.  Exh. 110, ECF No. 60-1 at 133–147.

[36] Exh. 112, ECF No. 62-1 at 52.

any legal training and didn't hold himself out as being a lawyer, Wilcock approached him for help with some of his legal issues.  House recalled helping Wilcock with a motion to dismiss his attorney, but he never saw any discovery materials concerning the facts of Wilcock's case.

One day the two were watching the movie Rambo.  As the titular character was surrounded and trapped alone in a cave, he threw live rounds of ammunition into a fire to make it appear that there were more people with him.  Wilcock told House, "it's good that the police and prosecutors don't believe" that could actually happen.[37]  House asked what he meant, and he said, "Well, they're still behind.  Still being fooled."[38]  At some point Wilcock told House that he scattered multiple rounds in Jimmy's house to "make the police think that there were multiple people in the house" and "set them off" by starting the fire.[39]  He told House that he set the fire to cover up the murder.  And, speaking hypothetically, he also told House that, if he were he to start a fire, he would "place an accelerant" and wadding "between the floors."[40]

Wilcock also told House details of the murder.  He told him that Jimmy was found sitting in his chair, almost smiling with his cap on, and he had been shot in the head.  He mentioned that even if they had found Jimmy alive, he wouldn't have been able to tell them anything because he was high on crystal meth.  Wilcock also told House that the police were looking for two guns—a .38 and a .25 caliber—but only the .25 was used to kill Jimmy.  House testified that Wilcock told him he got the gun from a friend, telling her that he needed it to euthanize his girlfriend's dog.

House explained that he wrote a letter to Metro's homicide division informing on Wilcock "for the good of it," because Wilcock had been so cold and careless when discussing his

---

[37] *Id.* at 158.

[38] *Id.*

[39] *Id.* at 158–59.

[40] *Id.* at 167.

involvement in Jimmy's murder.[41]  He testified that, when he wrote the letter, he had already

pled guilty with a stipulated sentence on his grand-larceny charge and had nothing else to gain

from talking to the detectives in Wilcock's case.  During cross-examination, defense counsel

implied that Wilcock wasn't sentenced as a habitual criminal—a status he qualified for given his

many prior felonies—because he informed on Wilcock.[42]  But House testified that he was never

threatened with a habitual-criminal sentence and, while his plea agreement acknowledged that

the judge could choose to enhance his sentence as a habitual criminal, he was never told that he

wouldn't receive that enhancement in exchange for providing information about Wilcock.[43]

Instead, he asked only to be housed somewhere other than general population for his protection,

and he was transferred to protective custody at Lovelock Correctional Center as a result.

**C.   Wilcock is convicted, and his appeals and state postconviction petition are denied.**

The jury convicted Wilcock of murder with a deadly weapon, along with multiple counts

of burglary, robbery and possession of stolen property.[44]  He was sentenced to 44 years to life in

prison.[45]  Judgment of conviction was filed in February 2013,[46] and the Nevada Supreme Court

affirmed.[47]  The Nevada Court of Appeals affirmed the denial of his state postconviction petition

in February 2017.[48]

---

[41] Exh. 112, ECF No. 62-1 at 174.

[42] *Id.* at 179–80.

[43] *Id.* at 152, 191–92.

[44] Exh. 122, ECF No. 65-4.

[45] Pet. Exh. 1, ECF No. 13-1.

[46] *Id.*

[47] Pet. Exh. 5, ECF No. 13-5.

[48] Pet. Exh. 16, ECF No. 13-16.

**D.      This case proceeds on four of Wilcock's six claims for habeas relief.**

Wilcock dispatched his federal petition in July 2017 and moved for counsel.[49]  I granted the motion and appointed the Federal Public Defender.[50]  In May 2019, Wilcock moved to stay this case while he pursued *Brady* claims in state court related to the state's alleged suppression of evidence involving House's conviction history.[51]  I granted the stay and later reopened the case in October 2021 after the Nevada Court of Appeals affirmed the denial of his second postconviction motion as procedurally barred.[52]  Wilcock filed a counseled third-amended petition alleging six grounds for relief.[53]  I granted the respondents' motion to dismiss in part and dismissed ground 3 as untimely and ground 4 as noncognizable,[54] leaving the following claims:

- Ground 1: Wilcock's Fifth, Sixth, and Fourteenth Amendment due-process and fair-trial rights were violated when the state suppressed favorable, material evidence that jailhouse informant Todd House had multiple convictions and arrests for offenses bearing on his honesty and truthfulness.

- Ground 2: The state's suppression of the evidence of House's criminal history denied Wilcock an adequate opportunity to confront House, violating the Sixth Amendment.

- Ground 5: Wilcock was denied his Fifth, Sixth, and Fourteenth Amendment rights to a speedy trial due to a lengthy postponement of trial; and

- Ground 6: Wilcock was denied his constitutional rights under the Fifth, Sixth and Fourteenth Amendments due to cumulative error.[55]

---

[49] ECF No. 1-1.

[50] ECF No. 7.

[51] ECF No. 30.

[52] ECF Nos. 32, 44, 69-4.

[53] ECF Nos. 40, 44, 46.

[54] ECF No. 85.

[55] ECF No. 46 at 10–45.  Respondents answered the remaining claims and Wilcock replied.  ECF Nos. 88, 99.

### Discussion

**A.      Standards of review under the Antiterrorism and Effective Death Penalty Act**

Federal habeas relief is governed by the Antiterrorism and Effective Death Penalty Act, also known as "AEDPA."  If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[56]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[57]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[58]  AEDPA does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[59]  The "objectively unreasonable" standard is difficult to satisfy;[60] "even 'clear error' will not suffice."[61]  As the Supreme Court acknowledged

---

[56] 28 U.S.C. § 2254(d).

[57] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[58] *White v. Woodall*, 572 U.S. 415, 424–27 (2014).

[59] *Id.* at 1705–06.

[60] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[61] *Wood v. McDonald*, 575 U.S. 312 at 316 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

in *Harrington v. Richter*, "[i]f this standard is difficult to meet, that is because it was meant to be."[62]

So the bar is high, and federal habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[63] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[64] "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[65] AEDPA "thus imposes a highly deferential standard for evaluating state-court rulings, . . . and demands that state-court decisions be given the benefit of the doubt."[66] If a federal district court finds that the state court committed an error, the district court must then review the claim *de novo*.[67] The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[68] and state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[69]

---

[62] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[63] *Id.*

[64] *Id.* at 103.

[65] *Id.* at 101.

[66] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (cleaned up).

[67] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of [28 U.S.C.] § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[68] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[69] 28 U.S.C. § 2254(e)(1).

**B.    Wilcock hasn't shown that any allegedly suppressed *Brady* evidence was material or prejudicial, so ground 1 is denied.**

In ground 1 Wilcock claims that the prosecution suppressed favorable and material evidence in violation of his constitutional rights by failing to disclose House's multiple convictions for crimes involving dishonesty or untruthfulness.[70]  Wilcock presented this claim in his second state postconviction habeas petition.[71]  The Nevada Court of Appeals held that the petition was procedurally barred and rejected his contention that this alleged *Brady* violation demonstrated cause and prejudice to excuse the default.[72]  The appellate court concluded that Wilcock had failed to show a reasonable possibility of a different trial outcome because the evidence of his guilt was overwhelming:

> The relevant witness testified at trial that he was serving a prison sentence, had been arrested multiple times, and had multiple prior felonies that included crimes involving dishonesty.  And even excluding the witness's testimony, significant evidence of Wilcock's guilt was presented at trial.  Cell phone data demonstrated Wilcock's phone was in the area around the victim's residence when the victim died.  The victim's neighbor saw Wilcock at the victim's residence days after the victim died.  Shortly after the victim died, Wilcock pawned items owned by the victim and placed items owned by the victim for sale on the internet.  A search of Wilcock's mother's residence also revealed additional items that belonged to the victim.  In addition, Wilcock had a .25 caliber handgun and the victim was killed with a .25 caliber bullet.  Wilcock also participated in an interview with a detective and provided details about the location of the victim's body that he would only have known if he had seen the body.  Because the witness testified at trial to his extensive criminal record, and in light of the significant evidence of Wilcock's guilt presented at trial, Wilcock did not demonstrate a reasonable possibility that additional information concerning the witness's criminal record or arrest history would have affected the outcome

---

[70] ECF No. 46 at 10–28.

[71] Exh. 193, ECF No. 69-4.

[72] Exh. 193, ECF No. 69-4 at 4–5.

of the trial.  And because Wilcock did not demonstrate the withheld evidence was material, we conclude the district court properly decided that Wilcock did not demonstrate actual prejudice sufficient to overcome the procedural bars.  Therefore, we conclude the district court did not err by denying this good cause claim.[73]

In a prior order, I concluded that the appellate court's procedural decision doubled as a decision on the merits of Wilcock's *Brady* claim because it relied primarily on *Brady* and its progeny to come to its procedural conclusion.[74]  So, because the Nevada Court of Appeals did not rely on a wholly independent state reason to deny the claim, I review the state decision as it relates to the merits of Wilcock's federal *Brady* claim.

### 1.       *Brady* requires the state to turn over to the defense favorable, material evidence.

The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution."[75]  "There are three components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the state, either willfully or inadvertently; and prejudice must have ensued."[76]  The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists.[77]

---

[73] Exh. 193, ECF No. 69-4 at 4–5.

[74] ECF No. 85 at 8–10 (citing *Cooper v. Neven*, 641 F.3d 322, 332 (9th Cir. 2011) (holding that the cause-and-prejudice standard "dovetails exactly" with the components of a *Brady* claim and concluding that a state timeliness bar to a petitioner's *Brady* claims thus is not an "independent" state reason for dismissing a petition)).

[75] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[76] *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (cleaned up).

[77] *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[78]  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."[79]  Accordingly, a "'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"[80]

### 2.     *Wilcock hasn't shown that any allegedly suppressed evidence was material.*

Wilcock asserts that House is a "conman" and a "liar" who had several more arrests and convictions involving dishonestly than just those that House testified about at trial.[81]  House testified about convictions from 1985, 1989, 1992, and 2012.[82]  But Wilcock contends that the prosecution left out other charges that House picked up from 2001 through 2003, for buying cars with fraudulent checks, posing as a doctor or soldier in the attempt to make his victims believe he was trustworthy.[83]  Wilcock asserts that information about House's convictions qualifies as *Brady* material because the dishonest nature of his crimes could have been used to attack his credibility.  Wilcock claims the evidence is material and that withholding it was prejudicial

---

[78] *United States v. Bagley*, 473 U.S. 667, 682 (1985).

[79] *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

[80] *Id.* (quoting *Bagley*, 473 U.S. at 678).

[81] ECF No. 46 at 18–27.

[82] Exh. 112, ECF No. 61-1 at 151–53.

[83] ECF No. 46 at 20–25.  The government points out that some of the charges listed in Wilcock's petition were dropped before being prosecuted or were reduced to judgment after House testified at Wilcock's trial.  ECF No. 88 at 15.

because House was the witness to tie together all of the circumstantial evidence linking Wilcock to Jimmy's death, making his credibility critical to Wilcock's conviction.[84]

I assume without deciding that the state didn't provide Wilcock some pertinent information about House's prior convictions.[85]  But even then, Wilcock hasn't shown that not being able to impeach House with details from those convictions undermines confidence in the outcome of his trial.  The prosecution owned the fact that House was a seasoned criminal with several felonies and even more arrests for theft and fraud.  The undisclosed convictions that Wilcock raises now are merely cumulative of those that were discussed at trial and that Wilcock's counsel could have (but didn't) use to further impeach House.[86]  The Nevada Court of Appeals reasonably applied federal law when it concluded that this additional information wasn't material "[b]ecause the witness testified at trial to his extensive criminal record."[87]

The Nevada Court of Appeals' determination that disclosing additional impeachment information wouldn't have made a difference in Wilcock's trial was also a reasonable application of *Brady* and its progeny.  The appellate court reasoned that "significant evidence of Wilcock's guilt was presented at trial" that would have led to the same result with or without House's testimony.  "Gauging the collective impact of the withheld evidence" requires courts to "step

---

[84] ECF No. 99 at 30.

[85] Wilcock doesn't clearly explain what was disclosed and what wasn't, and he lists in his petition some convictions that were brought up at trial.  The Nevada Court of Appeals skipped over whether this evidence was indeed withheld, instead focusing on whether the allegedly suppressed information was material.  Exh. 193, ECF No. 69-4 at 4–5.  I do the same.

[86] *See* Exh. 112, ECF No. 62-1 at 176–90, 199–202, 205 (cross-examination of Todd House); *Hooper v. Shinn*, 985 F.3d 594, 618 (9th Cir. 2021) (finding that failure to provide cumulative impeachment evidence was not material or prejudicial).

[87] Exh. 193, ECF No. 69-4 at 4–5.

1   back and consider the strength of the prosecution's case."[88]  And that's just what the Court of

2   Appeals did when it detailed the voluminous and independent evidence tying Wilcock to the

3   alleged crimes.  Because the state court reasonably applied Supreme Court precedent in denying

4   Wilcock's *Brady* claim, I deny ground 1.

5
6   **C.  Wilcock hasn't shown that any withheld impeachment evidence violated his Sixth Amendment rights either, so ground 2 is denied.**

7       *1.  This court reviews Wilcock's confrontation-clause claim de novo.*

8       Wilcock asserts in ground 2 that he was denied the right to confront House because

9   evidence of House's prior convictions was suppressed.[89]  Wilcock contends that this court should

10  review this claim de novo because the Nevada Court of Appeals overlooked it.[90]  Indeed, the

11  order of affirmance does not mention the confrontation clause at all, instead focusing on the

12  *Brady* aspects of Wilcock's claims.  The state seems to suggest that the appellate court addressed

13  both claims under the *Brady* framework and asks that I do the same.[91]  But, as Wilcock suggests,

14  these are separate constitutional claims, and it does appear that the Nevada Court of Appeals did

15
---

16  [88] *Hooper*, 985 F.3d at 620.

    [89] ECF No. 46 at 28–30.

17  [90] ECF No. 99 at 36–37.

18  [91] The government cites *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), for the proposition that
19  "the failure to produce exculpatory evidence [is] addressed" under the due-process clause of the
    Fourteenth Amendment, not the Sixth Amendment.  ECF No. 88 at 17–18.  *Ritchie* did suggest
20  that, but only as it relates to the Sixth Amendment's compulsory-process clause, not the
    confrontation clause.  *Ritchie*, 480 U.S. at 55–56.  But the Ninth Circuit has since explained that
21  "[n]either the Supreme Court nor our court has definitively determined whether the government
    violates a defendant's confrontation right by delaying the disclosure of impeachment materials
22  that are necessary for the defendant to confront the witnesses against him in a meaningful
    manner, but we have generally assumed without deciding that such a claim is cognizable."
23  *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 823 (9th Cir. 2024) (cleaned up).  In
    *Alahmedalabdaloklah*, the Ninth Circuit recognized the distinction and proceeded to separately
    evaluate the *Brady* claim and the confrontation-clause claim based on withheld evidence.  *Id.*  I
    follow the Ninth Circuit's lead.

not address Wilcock's separate Sixth Amendment claim based on the inability to cross-examine House with relevant impeachment evidence.  "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, [28 U.S.C.] § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge."[92]  So I review de novo Wilcock's confrontation-clause claim.

### 2.     *The confrontation clause protects a defendant's right to cross-examine and impeach state witnesses.*

The Sixth Amendment guarantees a defendant in a criminal trial the right to confront the witnesses called against him.  The right to confront witnesses encompasses not only the right to a face-to-face meeting with the witnesses testifying against the defendant, but also the right to cross-examine witnesses to attack their credibility or show bias or ulterior motives in testifying.[93] But "[t]he Confrontation Clause guarantees [only] an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[94]  "Nor does the Confrontation Clause 'require the government to disclose all documents that might be helpful on cross-examination.'"[95]  A criminal defendant's confrontation rights are violated if he is prevented from otherwise appropriate cross-examination that might expose a witness's bias.[96]  "To determine whether a defendant received an adequate opportunity for effective cross-examination," courts "ask whether 'a reasonable jury might have

---

[92] *Johnson v. Williams*, 568 U.S. 289, 303 (2013).

[93] *See Delaware, v. Van Arsdall*, 475 U.S. 673, 678–79 (1986).

[94] *Id.* at 679, quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

[95] *Alahmedalabdaloklah*, 94 F.4th at 823 (quoting *United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1030 (9th Cir. 2009)).

[96] *Van Arsdall*, 475 U.S. at 680.

1  received a significantly different impression of [the witness's] credibility had [defense] counsel

2  been permitted to pursue his proposed line of cross-examination'" and "'whether the exclusion

3  of evidence left the jury with sufficient information to assess the credibility of the witness.'"[97]

4      Even if a court finds that the confrontation-clause has been violated, that violation is

5  "subject to . . . harmless-error analysis.[98]  "The correct inquiry is whether, assuming that the

6  damaging potential of the cross-examination were fully realized, a reviewing court might

7  nonetheless say that the error was harmless beyond a reasonable doubt."[99]  To make that

8  determination, a court may consider "the importance of the witness's testimony in the

9  prosecution's case, whether the testimony was cumulative, the presence or absence of evidence

10  corroborating or contradicting the testimony of the witness on material points, the extent of

11  cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's

12  case."[100]

13        ***3.     Any confrontation-clause error was harmless.***

14      Assuming for the purposes of this order that the state failed to produce evidence that

15  Wilcock's counsel would have used to successfully impeach House, that error was harmless.

16  House's testimony was largely a corroboration of the testimony of several other witnesses

17  holding clues to Wilcock's guilt in this case.  It did not contradict any other testimony or supply

18  information that wasn't discussed by those other witnesses.  Defense counsel also had the

19

20  [97] *Alahmedalabdaloklah*, 94 F.4th at 823 (quoting *Van Arsdall*, 475 U.S. at 680, then quoting

21  *United States v. Larson*, 495 F.3d 1094, 1102 (9th Cir. 2007) (en banc)).

21  [98] *Van Arsdall*, 475 U.S. at 684 (holding that "the constitutionally improper denial of a
defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is

22  subject to . . . harmless-error analysis").

23  [99] *Id.*

    [100] *Id.*

1  unrestricted right to further impeach House with the evidence he did have about House's prior

2  felonies.

3        Plus, as the Nevada Court of Appeals found when denying relief on Wilcock's *Brady*

4  claim, the prosecution's case without House's testimony was quite strong.  Eyewitness testimony

5  and cell-phone records placed Wilcock at Jimmy's home during the week in which he was

6  missing.  Wilcock pawned several of Jimmy's items after he was seen bringing them to his

7  mother's house within that timeframe, too.  He told people elaborate lies about seeing Jimmy

8  that week and "helping" him clean up after a nonexistent fire.  Jimmy's truck key was found in

9  Wilcock's trash can.  Testimony established that Wilcock had access to a gun that fired the same

10  caliber of bullets that were used to kill Jimmy.  And during a police interview, Wilcock provided

11  details of the crime scene that he couldn't have otherwise known.  In light of this plentiful

12  evidence of Wilcock's guilt, even if the jury disregarded all of House's testimony as not credible,

13  the outcome of Wilcock's trial would have been the same.  So I conclude that any possible error

14  was harmless beyond a reasonable doubt, and I deny Wilcock relief on his confrontation-clause

15  claim.

16

17  **D.**    **Wilcock has not shown that his right to a speedy trial was violated, so relief on ground 5 is denied.**

18        Wilcock argues that the five-month postponement of his trial violated his constitutional

19  rights.[101]  He contends that the government's reason for delay—court congestion—is not a

20  sufficient excuse to keep a detained defendant waiting for his day in court, and that the delay

21  prejudiced him because had he gone to trial in July as planned, he would have never spoken to

22

23  _____

[101] ECF No. 46 at 39–44.

Todd House (who was booked into CCDC that month and wrote to the detectives in Wilcock's case in August).[102]

### 1. Courts balance four factors to determine whether a defendant's speedy-trial rights were violated.

The Sixth Amendment guarantees a criminal defendant a speedy trial. Courts weigh four factors to determine whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his rights; and (4) prejudice to the defendant.[103] "The length of delay is the threshold factor."[104] "To trigger a speedy-trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay."[105] "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case"; "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."[106]

### 2. The Nevada Supreme Court reasonably determined that Wilcock's delay was not presumptively prejudicial.

The Nevada Supreme Court held on direct appeal that the district court did not err in denying Wilcock's motion to dismiss due to a speedy-trial violation:

---

[102] *Id.* at 42–44.

[103] *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

[104] *United States v. Myers*, 930 F.3d 1113, 1119 (9th Cir. 2019).

[105] *Doggett v. United States*, 505 U.S. 647, 651–52 (1992) (cleaned up).

[106] *Barker*, 407 U.S. at 530–31. Though there is no bright-line rule for when a delay crosses the ordinary-to-presumptively-prejudicial line, "courts generally have found that delays approaching one year are presumptively prejudicial." *United States v. Gregory*, 322 F.3d 1157, 1161–62 (9th Cir. 2003).

> We conclude that dismissal was not warranted because a five-month delay due to a congested court calendar is not presumptively prejudicial and Wilcock failed to demonstrate the type of prejudice that the rule is intended to prevent.[107]

The appellate court's finding that Wilcock's delay was not presumptively prejudicial was a reasonable application of Supreme Court precedent. Wilcock's first-degree murder trial—with extensive testimony about the police investigation, forensics, and numerous percipient witnesses—certainly did not fall into the "ordinary-street-crime" category. Nor do the other factors weigh in favor of finding a speedy-trial violation. Though Wilcock clearly invoked his speedy-trial right, he also agreed, albeit reluctantly, to the December trial date. And while the responsibility for a congested docket rests with the government, the defense agreed to move the trial date, stating a preference for keeping the case in front of the presiding judge over trying it sooner and before a different judge who lacked any history with the case.

The state court's finding that "Wilcock failed to demonstrate the type of prejudice that the rule is intended to prevent" was also reasonable. Wilcock primarily argues that because House wasn't placed into custody until July 2012 and didn't reach out to the detectives until August, the State would not have had the benefit of House's testimony had the case been tried in July. While true, this is not the type of prejudice that the right to a speedy trial is intended to prevent. The speedy-trial right is meant to protect a defendant's interests like avoiding "oppressive pretrial incarceration," minimizing his "anxiety and concern," and not being hindered in his ability to adequately prepare his case.[108] While the postponed trial resulted in House and Wilcock being in custody together, it was not the delay that hurt Wilcock's case—it

---

[107] Pet. Exh. 5, ECF No. 13-5 at 8.

[108] *Barker*, 407 U.S. at 531.

was his decision to blab to House.  Wilcock cannot show that the state courts' conclusions that the postponement of the trial did not violate his speedy-trial right were contrary to, or involved an unreasonable application of, clearly established Supreme Court law or were based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.  So I deny federal habeas relief on ground 5.

### E.     Ground 6 is denied because Wilcock has not shown that cumulative error violated his constitutional rights.

In his final claim, Wilcock contends that he was denied his constitutional rights due to cumulative error.[109]  The cumulative effect of multiple errors can violate due process and warrant habeas relief if the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."[110]  The Nevada Supreme Court rejected Wilcock's cumulative-error claim because it concluded that the only identifiable error at trial—the admission of the dynamic text dictionary from Wilcock's cell phone—was harmless.  I haven't found any additional error to give me a cumulative set of errors to even consider for this claim. So I deny grounds 1, 2, 5, and 6.

### F.     Wilcock is denied a certificate of appealability.

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[111]  "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must

---

[109] ECF No. 46 at 44–45.

[110] *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).

[111] 28 U.S.C. § 2253(c).

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[112]  Because I conclude that reasonable jurists would not disagree with my resolution of the merits of Wilcock's claims, I decline to issue a certificate of appealability in this case.

## Conclusion

IT IS THEREFORE ORDERED that the petition **[ECF No. 46] is denied in its entirety.**

IT IS FURTHER ORDERED that a certificate of appealability will not issue.

The Clerk of the Court is directed to:

- substitute Nethanjah Breitenbach for Respondent Jo Gentry;

- enter judgment accordingly and close this case.

_____
U.S. District Judge Jennifer A. Dorsey
September 17, 2024

---

[112] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).